Our final case today is United States v. Abney, and I'm familiar with the proposition that there's a motion to seal the courtroom, and I'll just say that we don't look on those kinds of motions with much favor. We conduct proceedings in open court, as a general proposition. So we'll start out in that context. If there's something that the lawyers need to say and need to argue about that they think is sealed and that they're going to breach some sealing ruling made by the district court, you can hold it to the end or you can let us know and we'll perhaps close the courtroom at that point if there's anybody still in here. But at this stage, we're going to plow forward. And Ms. Kahn, you're representing Mr. Abney? Good morning, may it please the court. I'm Marta Kahn. I represent Richard Abney in this matter. Given the court's ruling on the motion to seal, my comments are going to be extremely limited as the issue involves whether the lower court erred in finding that the government proved by clear and convincing evidence that... Why will your comments be extremely limited? What is it that's your problem? Well, Your Honor, the problem is that the entire hearing below was sealed, therefore the exhibits, which are the studies that are involved, were also sealed. There were five forensic evaluations done of the defendant, which are key to this issue, which are all sealed. Basically, the very fact of his diagnosis is sealed. Other than the procedural history, there's very little that I can discuss. This entire volume of the joint appendix is sealed. So I'm limited to saying that the district court erred when it found that the government had proved by clear and convincing evidence that Mr. Abney could be restored to competence to stand trial via forcible medication. One of the problems that happened is that in this court's Watson, the court found that a syllogistic reasoning cannot be used to justify forcible medication. In other words, the expert cannot simply say, the person suffers from illness A, and that illness is treated by forcible medication, and therefore this person can be restored by forcible medication. And that is exactly what the expert did here. I cannot comment on what the expert said in his reports or his testimony due to the fact that that's all sealed. I can say that the expert did not refer to various of Mr. Abney's personal characteristics that should go into the calculation of whether a particular medication would be effective if in Evans and Watson, the report was not sufficiently individualized to his condition. Again, I can't discuss the studies that the expert relied on. They're part of the sealed appendix as well, except to say that... What was the basis for sealing everything in pro-forma? They were largely pro-forma. Some of them were sua sponte. Did anybody say that court proceedings are presumptively open to the public? I was not a party to the first part of the case when I came on. Much of it had already been sealed. When I arrived at the hearing, the courtroom lawyer was the only one we got. You're the only one we got on this side. Yes, Your Honor. There are rules about it. There's law about it. We, once in a while, seal courtrooms. We've got top secret material and stuff. This is a criminal proceeding and there's medical records. We don't recognize that. But there's hoops you have to jump through to start closing court proceedings. Yes, Your Honor. The motions to seal were filed. They were granted. The hearing, when I arrived there, the courtroom was sealed by the court sua sponte, presumably because of the extent of the material that was going to be discussed at the hearing. The basis for the sealing was the very sensitive personal medical information pertaining to Mr. Abney and the fact that he's been convicted of nothing and this personal information is going to be exposed in this manner. There was a motion to unseal filed by the government following the conclusion of the brief. That motion was denied by the district court, so all the materials remain sealed. You filed a response to that? I did. I opposed it. You wanted it sealed for some reason. Well, our position was that this is sensitive medical information. That's the basis for it? Say it's sensitive medical information? And if it was unsealed, it would prevent a fair trial? Well, no. It's just prejudicial to his privacy. His rights to a fair trial? I don't think that it would affect him at trial, no. It has been my experience in reading other cases and the other competency cases in which I was involved that the forensic evaluations were sealed in those cases, just as pre-sentence reports are routinely sealed. And in this case, the entire bulk of the case that is pertinent here today is sealed. If the court wishes to... Have you ever heard of this court conducting sealed proceedings? I've never participated in one and I probably hadn't thought about whether one was sealed. We have in very limited circumstances, mostly involved top secret material. Even then, we would conduct most of the arguments without sealing the courtroom and perhaps a little bit of it when they really got into the top secret stuff. And maybe there are others that I don't know about. But anyway, I just wondered how y'all got into this. Which of the four cell factors do you think the judge got wrong? My argument is mostly focused on the second cell factor, which is whether the government proved by clear and convincing evidence that Mr. Abney can be restored to competence through, is substantially likely to be restored to competence through... You don't argue that. I mean, that's the only factor you contest. That's, yes, both. There's two prongs of that, but yes. And the reason that I can't address that is that I'm saying that the diagnosis, well, first of all, I'm saying that his medical opinion was not justified properly by the studies. The judge abused his discretion. The court abused his discretion. I believe it's clearly errored. You think it's clear error? I believe it's clear error. All right. That's even tougher. Yes, it is. I agree that it's a tough standard. However, it was satisfied in Watson. And I believe in Watson, there was more individuation of the report than there was in this case. Well, you can refer to that generally, I think. Yes. And that's what I'm saying. So that I don't believe that the doctor's report was sufficiently individualized to Mr. Abney. And it really... The doctor's interview, Mr. Abney? Yes. There are three forensic reports from the Bureau of Prisons and two from a defense expert. Actually, there's four from the Bureau of Prisons because one involves the cell question. And did they involve personal examinations? Do any or all of them involve personal examinations of Mr. Abney? Yes, they did, as they do in... And as they did in Watson, which was reversed. Right. And so why, generally speaking, were they not... Why did they not meet the standard, the appropriate standard? Because according to Evans and Watson, it's not sufficient to say that a person suffering from a particular illness, and sort of generally speaking, that illness is treatable with medication, therefore that person's treatable. One has to look at individual characteristics, such as their disease duration, the disease onset, their age, their... The studies... I think I can say, in general, studies on these things refer to various factors like that, which were not taken into account. Basically, the doctor said, I believe he has this illness. I know this illness is treatable. Therefore, he's substantially likely to be restored. And that's insufficient under... The doctor did rely on published studies in this area. Yes, he did. And I was prepared to discuss why I don't believe that the studies supported his conclusion. I don't understand why you can't argue that. They're published studies, and you're criticizing. If I may, and I'm not... Because they were entered in exhibits in a sealed proceeding, if I'm... It requires a little effort. It's not undoable. And I think everybody's trying to suggest how it can be done. Okay. And one of the ways is to comment on the published... On why you think the published studies that were relied upon were not compelling. Very well. I'm certainly prepared to do that. I wasn't quite sure the effect of sealing on those studies. But to the extent that they are published studies, for example... And I can't say a lot without saying what the diagnosis is, which is sealed. But for example, there was a study cited by Mossman, in which the expert relied on that to say 75% of 268 incompetent inmates were restored. However, not all of those people had the illness that my client is alleged to have. Only 166 people had that, and 63 of those people were not restored. In that study, not even all of them were treated with medication. There's no indication that those that were, were treated with forcible medication. And in fact, the study itself... I'm sorry? No, go ahead. And in fact, the study itself referred to the comparative difficulty of restoring people with the illness that my client's been diagnosed with. And in fact, due to the limitations of the study, the author said, I do not recommend that forensic examiners use my predictive equations to calculate probability of restoration. And again, so that study does not prove definitively that my client's condition is substantially likely to be restored with forcible medication. Another study that he cited is the Herbell study. This court's commented on the Herbell study, which actually, it's a study of 22 people's paper files. It involves a condition that my client does not have. So it is not relevant to whether his condition can be restored by forcible medication. Why did we need to evaluate the academic literature at length when, as I read it, the conclusion at issue was based in large measure on personal observation? Personal observation isn't a subject... Personal observation gets you to the point of figuring out what the diagnosis is. And the diagnosis is basically now acting as a proxy, as a stand-in for restorability, which Watson and Evans said you can. As well as considerations of age, symptoms, recent diagnoses, and other medical history. I do not believe those things were properly considered in the report. In fact, the section of the report which makes this recommendation mentions my client's name twice. One of them is in reference to this study that does not apply to him, and one is in sort of a conclusory way. It's very, very short. It's almost like a cut and paste could be applied after it describes his illness, explaining why forcible medication would be substantially likely to restore him. It doesn't say anything about him in particular. And so that leaves us with the firm and definite conviction that a mistake was made? I believe so, because in Watson there was more individuation than even in this case. And the whole point of Cell and its progeny in this court is that these orders are to be extremely rare and not to become routine. And if every person with this illness is diagnosed and therefore is ipso facto restorable by forcible medication, then Cell, Watson, Evans have essentially been gutted. So it is possible that. And in this case, given how little he said in his testimony, how little he put in his report, the fact that the studies don't actually support the conclusion that he made leads me to believe. And the fact that the lower court's order basically says I'm simply incorporating the reports of the expert, which don't... You're doing a pretty good job here now. Do the best I can, Your Honor. So I can refer to... Are you familiar with this Calori case that we had earlier this year? Calori? Calori, C-A-L-U-O-R-I. I'm afraid I'm not. January 21st. Oh, I'm... They involve one of these similar situations about unwanted medications. I'm shocked I would have missed that. I was familiar with the sheet. It's unpublished. Okay. It's unpublished. There was... He upheld the order of the district court and that was being challenged. Anyway, and we said, Calori argues on appeal that the district court abused his discretion in requiring him to take prescribed medications. So that talked about it being a review for abuse of discretion. And then we stuck a footnote in here and said that we are troubled that the entirety of the opinion and substantial portion of the record are unsealed, are sealed, are sealed, not unsealed. As we recently emphasized, it's a foundational principle of our judicial system that court presumptively open to public scrutiny. And we cite Casey. In that vein, we suggest the district court examine its opinion in the record and unseal any portions that should be made public. Anyway, and quote from that case where we advised the district court to consider alternatives to sealing the entirety of the record and carefully weigh the competing interest at stake. Anyway, that was the Calori case. That was from down in North Carolina, but it's unpublished. But that was earlier this year. And I'm not saying it's on all fours or anything, but it would maybe provide some insight. Anyway, we appreciate it and I think you did a pretty good job. Thank you, Your Honor. I know you're court appointed and you saved some time too for rebuttal. I will. Thank you. Thank you, sir. Mr. Aizant. Are you going to be able to argue your side all right? Your Honor, I'll do my best. May it please the court, on behalf of the United States, I'm Assistant U.S. Attorney Jeff Aizant. And Your Honor, at the beginning, I'll just state, I'll try to argue the case by referring to the diagnosis. And so when I'm talking about the diagnosis, that's the one that this particular defendant has. At the outset, I'll state that we would ask this court to reverse the district court's decision, denying our motion to unseal the record. Just before we filed our brief in this case last November, we moved the district court and made arguments as to why this case should be unsealed, including that none of the prior cases in this area of the law are sealed. And they all discuss private medical information the same way this case does. Nothing about- You filed a notice of appeal at that point. We didn't file a notice of appeal on that point. And we also moved in the alternative to sealing this case to unseal it as well today. You moved to seal the courtroom. We moved to seal the courtroom in respect to the district judge's rejection of our motion. But in the alternative, we asked that it be unsealed. And Your Honor, just going back to what happened in the district court below, at the time the sealing orders first came up, it wasn't clear to the government that this would be an appeal, that this would be an issue. Are you familiar with that Calori case? Your Honor, we're not familiar with that case as well. But we would agree with the principle- I guess maybe we should have published it, three or four pages long. We generally are more familiar with the published opinions when they come out. But in any event, we agree with the foundational principle that the public has a right to know why this defendant may or may not be held to account for his conduct. And that's the reason underlying the other cases in this area as well. Evans, Bush, Watson, White, Sheik, an unpublished case just two years ago. None of these cases were sealed. That being said, Your Honor, happy to move on and adjust the arguments with that in mind. So, the district court read the reports. There were an extensive amount of reports. The district court heard testimony from the witnesses. And it heard argument from the parties. And it decided that the government had established that involuntary medication was permissible under Selin. Because that decision was not clearly erroneous, this court should affirm. In terms of the syllogism argument, that mischaracterizes the government's position on appeal. It is not a syllogism that the defendant has his diagnosis. That diagnosis is treatable. Therefore, the defendant was likely to be restored. It's more than that. It's considering the age, the nature and duration of his delusions, and his medical background. So, this defendant is a young man. This defendant has no prior psychiatric history. This defendant has no underlying medical condition. And he's never taken the drugs at issue. Which, as I understand, makes responsiveness, positive responsiveness, more likely. That's right. The evidence in the record showed, and the district court acknowledged, that first episode patients are more likely to be restored. And younger patients are more likely to be restored faster. So, all of the personal characteristics unique to this defendant counseled in favor of a restorability conclusion. The record established that the vast majority of incompetent defendants with his diagnosis are restored. The same is true for those who are treated involuntarily. And again, like I mentioned before, younger patients are more successful. First episode patients are even more successful than that. He's not taking it as far as side effects go. This defendant has no medical condition, no serious medical condition that would pose an obstacle or an issue with the side effects with the drug that's proposed to be treated with. I feel as though I should not refer to that specific drug. But this defendant is also not taking any other medications that that drug may interfere with. So, this is a case where all the personal characteristics unique to this defendant weigh in favor of restorability. As to the point that my colleague made about the studies in this case, stepping back, my first response is that this is classic re-weighing of the evidence. That's not what this Court does on clear error review. She's trying to— Do you think we got it wrong, and please have abuse of discretion in that other case, that we're reviewing this decision for clear error? I thought we reviewed findings of fact for clear error. So, Your Honor, the restorability determination is a finding of fact. No, but the order to medicate, the order to forcibly medicate, was reviewed for clear error, you say, rather than abuse of discretion? That's our understanding from Bush, Evans, and Watson, Your Honor, yes. Understanding that abuse of discretion is even more deferential to the district court. But this case, the district court's decision clearly survives clear error review because the appellant has not pointed to any evidence that's substantial and credible that undermines the decision. And there's no feeling that a definite mistake has been made on this record. I'll address two of the studies that she referenced just because they came up at oral argument, but these are examples for why this Court is not in the business of reweighing the evidence that the district court thoroughly considered. My colleague quoted from the Mossman study and talked about the comparative difficulty of restoring the defendant's diagnosis. Well, first, it's a comparative difficulty alleged in one study, but 62 percent of those with that diagnosis were restored. So to the extent that she's arguing, well, he's not restorable, that's not what the study shows. And then my colleague is quoting from the study itself and stating that the author does not—and I'm looking at Joint Appendix 291 right now, Your Honors—the study states, I do not recommend that forensic examiners use my predictive equations to calculate probabilities of restoration. But then the next sentence says as follows, my findings provide support for two circumstances in which mental health experts may opine that there's a low chance. So first, where the defendant has a longstanding psychic disorder. And second, if the defendant has an irredeemable cognitive disorder. And stepping back, in any event, the whole gist of that study, that's the Mossman study from 2007, is that previously there was pessimism. And Judge Floyd, you may be familiar with this because this was in the record in the Evans case. Previously there was a lot of pessimism about whether psychologists could make predictions like this. And the conclusion of the Mossman study is actually there are specific data that you can rely on. So length of duration of the psychological illness and irreversible brain disorders. My colleague also pointed out the Herbal study, which has surfaced in Evans and Bush and Watson, and criticized the district court for relying on, or the psychologist for relying on that study because that study didn't specifically address defendants with this disorder. But again, if you read the study, and again, that's not the gist of clear error review. But if you read the study, it states that we find a successful treatment outcome for delusional disorder. This is in Evans and Bush. It states as much in those decisions. The Herbal study also says this is similar to defendants with this defendant's condition. So while that study wasn't necessarily about this defendant's condition, the language in that study talks about how patients with his condition who are treated involuntarily are substantially likely to be restored, upwards of 80 or 90 percent. I also want to comment on my colleague's observation about the relative import of personal observations. I think Judge Duncan, you also asked about this. The government's position is not that, well, Dr. Tillbrook evaluated the defendant multiple times over almost a three-year period of time. I'm not sure that that actually was sealed, Your Honor. I wasn't sure. It just reinforces the difficulty of this, why it's problematic. Your Honor, we agree. We're happy to file a supplemental briefing or file an additional notice of appeal with respect to that decision, but I'll try and stay away from the name. It would be a little late to be filing a notice of appeal. That's true. Your Honor, the point is this. We're not relying on the doctor's personal observations alone. Those observations are helpful. The fact that he spent that much time with the defendant, it certainly supports his conclusion. This doctor had an opportunity to... The defendant criticizes the decision for not following the course of illness or the particular symptomology. There is no one in this case who is more familiar with the course of the illness or the particular symptomology than that doctor. It's not just his observations. It's what he stated about the state of the research with respect to those observations. He pointed out, this defendant has that condition. The research says that condition is highly likely to be restored. He said it's more likely for younger patients. This defendant is a young man. He said at the beginning of his report. And the appellant suggested that this was a cut and paste. That grossly mischaracterizes the nature of the reports that the doctor wrote in this case, but more importantly, the testimony that he gave. And the testimony that he gave showed without any doubt that he was intimately familiar with this defendant's condition, the lack of other medications, the nature of the research on this topic, and it's the reports in conjunction with the testimony that the district court considered. The last point I want to make in response to what my colleague stated was with respect to Watson and how Watson was a case in which the assessment was even more particularized than it was here. That's not true. There were numerous flaws in the report in Watson. There was competing expert testimony that the condition at issue in Watson was or was not restorable. The studies that relied on with respect to that condition were, in the court's words, equivocal. And they didn't relate to the proposed medication that the doctors in Watson were planning to give to that defendant. Here, I've already gone over all the ways in which the characteristics of the defendant were explored and explained and highlighted by the psychologist and the district court. But the psychologist also explained why he was planning to treat the defendant with the particular medication that he proposed. And he explained that first-generation and second-generation antipsychotic medication is equally effective against his condition. He explained that the medicine he proposed was a first-generation medicine. He explained that there are different types of side effects. One category of side effects was more likely with the first generation. Another category was more likely with the second generation. However, he stated that on balance, due to the defendant's age and the early onset of his symptoms, he didn't expect there to be an issue with regard to side effects, especially because there were no other medications at issue and there's no other medical condition. And in addition, he cited research. So I'd point to the LAD study. The LAD study is in the public domain. And the LAD study explains that, in fact, involuntarily, a patient's treated involuntarily with the very medication at issue here for the condition that the defendant has were substantially likely to be restored. And so, in fact, there's a great deal of support in the record with respect to both the reports and the testimony. Unless the court has any further questions for the government, we would submit on the rest of our briefs. We appreciate it. Ms. Collins? Very briefly, Your Honor. The government suggested that looking at the studies and examining the studies is tantamount to a re-weighing of the evidence. I just would point out that that's precisely what the court did in Bush and in Watson, and I believe should do so here. I don't believe that the studies cited by the expert mention any specific medications at all. I do not disagree that the expert did many evaluations and was able to describe the symptoms. However, I believe that government counsel just did a better job of trying to synthesize Mr. Abney's personal characteristics than the expert did. The section, I believe it's page 355 of the sealed joint appendix, is where there's – and also in the doctor's testimony, he makes two statements. Two statements. Basically two or three lines of testimony where he says, these kinds of medication restore 90 percent of people. But when you look at what he's citing, it doesn't say that. The studies do not – they aren't limited to people with this illness. The Nicholson study, he cited for the proposition that 90 percent of all incompetent defendants can be restored, and that of those 150, only eight were not restored. However, they only – many of the people in that study also did not have the same illness, and they were studied – the study considered whether they were restored after a period of hospitalization and really had nothing to do with how they were treated. So if the fact that these medications can restore this illness is so obvious, these all of these factors, this many people, and they don't say that. They're much – they are looking at not necessarily forcible medication versus taking medication voluntarily. Some of the people studied weren't even medicated. So the studies do not support the expert's conclusion, just as they did not in Watson. Do you – this case, if he gets restored, you're going to still represent him on the bank robbery chart? I will not, but my co-counsel will. You're in the – you're in this case court-appointed. Are you just for the limited purpose? Yes, sir. Okay. Who's going to represent him on the bank robbery? Below. Teresa Whalen, also court-appointed. He has another lawyer for that. Yes. Yes, she's been in since the beginning. I came in mid- You came in – you're the expert on this. Part midway during the competency proceedings, correct. I would just also like to add that I'm concerned that if this diagnosis becomes a proxy for being amenable or substantially likely to be restored by medication, there needs to be a greater degree of certainty as to the diagnosis than there was in this case. The – there's been a great – Mr. Abney has been diagnosed with a host of illnesses over the past five years. There were findings of competency, not competency, an array of different symptoms. So I don't think that the doctor – I don't think there's been a demonstration by clear and convincing evidence that he even has this disorder. And without that – I thought his own expert did not vary in diagnosing the disordered issue. The diagnosis is slightly different. And in fact, that expert says something I cannot say relevant to that point. But it is a slightly different diagnosis and it was a provisional diagnosis as well. Because it's been unfolding and there's been a great degree of disagreement between various providers that have seen him. These things – psychiatric conditions are often difficult to diagnose and evolve over time. But there needs – if we're going to deprive this person of his liberty to the extent that a forcible medication order entails, there has to be a greater degree of certainty than there is here. It is a massive interruption of liberty. It's basically a team in riot gear goes into his cell, puts him in five-point restraints on a bed, rips off his clothes and forcibly injects him with medication. So that – before that happens, we have to have great certainty that he has the condition if that condition is going to be a proxy for treatment. The order – the physician's order simply lacked the individualized factors that in this case the court has repeatedly said have to be present. And I apologize for the difficulty with the argument due to the extent of the ceiling. Thank you. You've done quite well. If the court does not have any further questions. Thank you very much. Thank you. We appreciate your efforts as appointee of the court to represent this fellow. You've done a good job. We'll come down and we'll adjourn court for the day and then we'll come down and greet counsel.
judges: Robert B. King, Allyson K. Duncan, Henry F. Floyd